HALL, Circuit Judge,
dissenting:
- The majority holds that a New York statute that discriminates, on its face, against nonresident attorneys — burdening them with the expense of maintaining an office in New’ York while exempting resident attorneys from the same requirement — does not offend the Privileges and Immunities Clause of Article IV, § 2 of the Constitution because, in the majority’s view, the plaintiff has failed to prove that the statute evinces a “protectionist” intent. In doing so, the majority injects an entirely novel proposition into our Privileges and Immunities Clause jurisprudence: that a State’s explicit discrimination against- nonresidents with regard[1] to a fundamental right is constitutionally unobjectionable unless the nonresident makes out a prima facie case of discriminatory intent. Such a holding reverses the State’s burden of demonstrating' that it has a substantial interest justifying the discrimination and that the means .chosen bear a close and substantial relation to that interest. Even under the majority’s reformulation of our settled law, however, Schoenefeld has established that the New York statute has protectionist aims, and the State’s proffered justifications for the discrimination fail to survive scrutiny. I respectfully dissent.
I.
The two-step inquiry to be conducted under the Privileges and Immunities Clause is well established. First, the court considers whether a State has, in fact, discriminated against out-of-staters ■ with regard to the privileges and immunities it accords its own citizens. See Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 94 (2d Cir.2003) (citing United Bldg. & Constr. Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 218, 222, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984)). “The activity in question must be sufficiently basic to the livelihood of the Nation .. as to fall within the purview of the Privileges and Immunities Clause.... For it is only *288 with respect to those ‘privileges’ and ‘immunities’ bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment.” Supreme Court of Va. v. Friedman, 487 U.S. 59, 64-65, 108 S.Ct. 2260 (1988) (internal quotation marks, citations and alterations omitted). Second, if the court determines that the State has, in fact, discriminated against out-of-state residents, the burden shifts to the State to provide a “sufficient justification for the discrimination,” Crotty, 346 F.3d at 94, by making a showing that “(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State’s objective.” Supreme Court of N.H. v. Piper, 470 U.S. 274, 284, 105 S.Ct. 1272 (1985).
On its face, New York Judiciary Law § 470 discriminates against nonresident attorneys with regard to the practice of law, long recognized by the • Supreme Court as a “fundamental right” subject to protection under the Privileges and Immunities Clause. Id. at 281, 105 S.Ct. 1272. As we explained in our prior opinion in this case, Schoenefeld v. New York, 748 F.3d 464 (2d Cir.2014), and the New York Court of Appeals unanimously agreed after we certified to it a question, Schoenefeld v. State, 25 N.Y.3d 22, 6 N.Y.S.3d 221, 29 N.E.3d 230 (2015), Section 470 draws a distinction between attorneys who are residents of New York and those who are not. The statute imposes no specific requirement on resident attorneys to maintain a bona fide office, thus permitting them to set up an “office” on the kitchen table of their studio apartments if so desired. Schoenefeld, 748 F.3d at 468. Nonresident attorneys, however, are required to maintain an “office for the transaction of law business” within the State. N.Y. Judiciary Law § 470. We recognized that “[t]his additional obligation carries with it significant expense — rents, insurance, staff, equipment inter, alia — all of which is in addition to the expense of the attorney’s out-of-state office, assuming she has one.” Schoenefeld, 748 F.3d at 468. Absent a controlling state decision that an “office for the transaction of law business,” § 470, meant something other than a bona fide office, we concluded that, “as it stands, it appears that Section 470 discriminates against nonresident attorneys with respect to their fundamental right to practice law in the state and, by virtue of that fact, its limitations on nonresident attorneys implicate the Privileges and Immunities Clause.” Id. at 469.
New York argued to us, however, that the statute could be interpreted as requiring no more than a P.O. box or designated agent for service of process, lessening the burden on nonresident attorneys considerably and making Section 470 more likely to survive scrutiny. Id. While our own review of New York law indicated that a designated physical office space was required, we recognized that the question had not been spoken to by the New York Court of Appeals, and we certified to that court the question: “Under New York Judiciary Law § 470, which mandates that a nonresident attorney maintain an ‘office for the transaction of law business’ within the state of New York, what are the minimum requirements necessary to satisfy that mandate?” Id. at 471. In doing so, we represented that the Court of Appeals’ answer would, “in all likelihood, dictate[ ] the outcome of the constitutional privileges and immunities analysis we have commenced and must complete as we decide the appeal'before us.” Id. The Court of Appeals accepted certification and graciously took time away from its own busy docket to unanimously answer that § 470 required the nonresidents maintain a physical office space. Schoenefeld, 25 N.Y.3d *289 at 26, 6 N.Y.S.3d at 223, 29 N.E.3d 230, As we had suspected, maintaining an address . or a designated agent for service would not satisfy the requirements of Section 470, See id.
The majority now disregards the New York Court of Appeals’ decision as well as our own prior opinion which, together, constitute the law of the case. See DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 76 (2d Cir.1992) (noting that, absent an intervening change in controlling law, availability of new evidence, or the need to correct a clear error or manifest injustice, a court’s decision upon a rule of law “should continue to govern the same issues in subsequent stages in the same case”) (internal quotation marks omitted). Those decisions acknowledged that. Section 470 discriminates between in-state and out-of-state attorneys solely on the basis of their residency. Under longstanding precedent, that determination disposes of the initial inquiry; the burden then shifts to the State to provide “suffíciént justification for the discrimination.” Crotty, 346 F.3d at 94. Departing from these precedents, however, the majority holds that the plaintiff bears the initial burden of “alleging] or offering] some proof of a protectionist purpose” in order to state a claim under the Privileges and Immunities Clause. Majority Op., ante at 280. In the majority’s estimation, if the plaintiff fails to allege a prima facie case' of protectionist intent, her “Privileges .and Immunities claim fails, obviating the need for a tailoring inquiry.” Majority Op., ante at 280.
The majority bases its reasoning exclusively on its reading of the Supreme Court’s decision in McBurney v. Young, — U.S. -, 133 S.Ct. 1709, 185 L.Ed.2d 758 (2013). As the majority acknowledges, that decision did not state any new principle of law, but merely confirmed that the Privileges and Immunities Clause forbids laws' that abridge the right to pursue a common calling only when those laws “were enacted for the protectionist purpose of burdening out-of-state citizens,”[1] Id. at 1715. McBumey did not disturb the traditional threshold inquiry and two-step analysis in cases, like ours, where the challenged law is one that directly regulates legal practice.. Rather, while acknowledging that the Privileges and Immunities Clause “protects the right of citizens to ply their trade, practice their occupation, or pursue a common calling,” id. (internal quotation marks omitted), the Court held that Virginia’s distinction between state citizens and noncitizens in its Freedom of Information Act (“FOIA”) , did not “abridge” a noncitizen’s right to pursue his livelihood “in the sense prohibited by the Privileges and Immunities clause” because the effects on his real estate business, which involved obtaining state property *290 records for his clients, were purely incidental. Id. ■■
The majority’s reading'that McBumey requires a plaintiff to allege, as part of a prima facie case, that the law was specifically enacted for a protectionist purpose misconstrues McBumey’s invocation of the two-step analysis.[2] As an initial matter, the Court resolved the threshold issue, whether a fundamental right is implicated, by noting that the Privileges and Immunities Clause protects the right the plaintiff claimed was violated.[3] See id. at 1715. The Court then considered whether sufficient justification existed for the discrimination[4]; it determined that the Virginia FOIÁ, as 'a mechanism for state citizens as the holders of sovereign power to obtain an accounting from public officials, evinced’ a “distinctly nonprotectionist aim.” Id. at 1716. ' Further, the statute’s distinction between Virginia citizens and noncitizens was justified because it “recognizes that1-Virginia taxpayers foot the bill for the fixed costs underlying record-keeping in the Commonwealth.” Id. It was within this context that the Court explained- that (1) the plaintiff “does not allege — and has offered no proof — -that the challenged provision of the Virginia FOIA was enacted in order to provide a competitive economic advantage for Virginia citizens,” id. at 1715, and (2) the statute’s “effect of preventing citizens of other States from making a profit by trading on information contained in state records” is merely “incidental.” Id. at 1716. In short, the Court’s reasoning — that the plaintiff failed ■ to contradict the State’s showing that the discrimination against noncitizens was justified — conforms precisely to the traditional two-step inquiry.
McBumey is distinguishable from this ease for the simple reason that the Virginia FOIA-is not an economic regulation, nor does it directly regulate the right to pursue a common calling. Rather, the FOIA provides a mechanism for seeking political accountability, and its effects on the plaintiff’s profession — data gathering for profit — were purely “incidental.”. Id. It is well-established that, “[wjhile the Clause forbids a State from intentionally giving its oym citizens a competitive advantage in business or employment, the Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen.” Id. Section 470, by contrast, directly regulates the legal. profession by expressly and intentionally placing practice requirements on *291 nonresident attorneys like Schoenefeld that it does not place on resident attorneys. The-majority stretches McBumey’s “incidental” language far beyond the facts of that case to support its conclusion that any regulation, even one that directly regulates a “well settled . -.. privilege protected by Article IV, § 2,” Barnard v. Thorstenn, 489 U.S. 546, 553, 109 S.Ct. 1294, 103 L.Ed.2d 559 (1989), will pass constitutional muster so long as its discrimination. against nonresidents cari be characterized as “incidental.” Majority Op., ante at 279-80.
By requiring plaintiffs to allege a pri-ma facie case of discriminatory intent, the majority, in effect, relieves the State of its burden to provide a sufficient justification for laws that discriminate against nonresidents with' regard to fundamental rights. See Crotty, 346 F.3d at 95 (explaining that States may not “treat Residents and nonresidents disparately in connection with the pursuit of commerce, a trade, or business venture where that disparate treatment is not supported by a sufficient justification”). Determining whether an unacceptable purpose, such as economic protectionism, underlies the challenged law is at the core of the analysis engaged in after the threshold determination into whether a right implicated by the Privileges and Immunities Clause has been abridged. See Piper, 470 U.S. at 284, 105 S.Ct. 1272 (“The conclusion that [a State law] deprives nonresidents of a protected privilege does not end our inquiry ... The Clause does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State’s objective.”).Examining the government’s proffered reason for the discrimination and determining whether -the challenged, law, as enacted, conforms to the proffered ' -reason -is the method by which courts determine whether the proffered reason is genuine or merely a pretext for economic protectionism. Crotty, 346 F.3d at 97 (“Part and parcel to this analysis is determining whether [the State] ha[s] demonstrated a substantial factor unrelated to economic protectionism1 to justify the discrimination.”). The majority’s reasoning would reverse this burden-shifting test by requiring plaintiffs to show that - a law was enacted for a protectionist .puRpose, rather than requiring the' State to show- that the -law was not enacted for a protectionist purpose.
Tellingly, in support of this proposition the majority draws exclusively on cases addressing challenges under the Equal Protection Clause, for which plaintiffs must plead discriminatory intent as part of a prima facie case. Majority Op., ante at 279-80 (citing, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Washington v. Davis, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). The majority has not cited, nor does there exist, any case suggesting that the requirement to allege discriminatory intent as part of a prima facie case under the Equal Protection Clause also applies to Privileges and Immunities claims. Indeed, Virginia v. Friedman, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988), stands for the opposite proposition. In. Friedman, . Virginia argued that its residency requirement for admission to the State’s bar on motion did not implicate the Privileges and Immunities Clause ,on the .basis that, because nonresident attorneys could seek admission by taking the Virginia bar exam, “the . State cannot be said to have discriminated against nonresidents as- a matter of fundamental concern.” Id. at 65, 108 S.Ct. 2260 (internal quotation marks omitted). The Supreme Court rejected that argument as “quite inconsistent with *292 our precedents,” stating that “the Clause is implicated whenever ... a State does not permit qualified nonresidents to practice law within its borders on terms of substantial .equality with its own residents.” Id, at 65-66, 108 S.Ct. 2260. This language cannot be squared with a prima facie requirement that demands something more than a showing of disparate treatment on the, face of the statute.[5]
The Equal Protection cases cited by the majority, moreover, are distinguishable on the ground that the challenged policies in those cases were facially neutral but produced racially disparate effects. See Iqbal, 556 U.S. at 682, 129 S.Ct. 1937 (holding that plaintiffs,failed to allege that detention policy that disproportionately affected Muslims and Arabs was motivated by a racially discriminatory purpose); Davis, 426 U.S. at 244, 96 S.Ct. 2040 (concluding that facially neutral employment test was not racially discriminatory simply because a greater proportion of African Americans fared poorly). The plaintiffs were thus required to allege facts showing that an otherwise-neutral policy was motivated by an impermissible discriminatory purpose. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Section 470, by contrast, draws -a facial distinction betweeri residents and nonresidents with regard to the privilege of practicing law; by its very terms, it imposes burdens on nonresidents that it does not impose on residents. Because the statute, on its face, discriminates against nonresidents, no other threshold showing of discriminatory intent is required.[6]
In sum, Section 470 discriminates against nonresidents with respect to the practice of law, a fundamental right long recognized as protected under the Privileges, and Immunities Clause. The majority recognizes as much, see Majority Op., ante at 281-82, but erroneously imposes a threshold requirement that the plaintiff challenging the discrimination prove there is a protectionist intent above and beyond the traditional analysis.
II.’
Plaintiff having established that a fundamental right has been implicated,- it is the State’s' burden to provide a sufficient justification for the discrimination by demonstrating that “(i) there is a substantial *293 reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State’s objective.” Piper, 470 U.S. at 284, 105 S.Ct. 1272. “In deciding whether the degree of discrimination bears a sufficiently close relation to the reasons proffered by the State, the Court has considered whether, within the full panoply of legislative choices otherwise available to the State, there exist .alternative means of furthering the State’s purpose without implicating constitutional concerns.” Friedman, 487 U.S. at 66, 108 S.Ct. 2260.
The State’s proffered justifications for the in-state office requirement — effectuating service of legal papers, facilitating regulatory oversight of nonresident attorneys5 fiduciary obligations, .and making attorneys more accessible to New York’s courts — are plainly not sufficient. Regarding the issue of service, the Court -of Appeals itself observed that, although “service on an out-of-state individual presented many, more1 logistical difficulties in 1862, when [Section 470] was originally enacted,” today there are' “adequate measures in place relating to service upon nonresident attorneys,” including 'the methods of mail, overnight delivery, fax and (where permitted) email, as authorized by the CPLR, and the requirement under 22 N.Y.C.R.R. § 520.13(a) that, nonresident attorneys designate, an in-state clerk of court as their agent for service of process in order to be admitted in New York. Schoenefeld, 25 N.Y.3d at 28, N.Y.S.3d at 224-25, 29 N.E.3d 230. Thus, not only do “there exist alternative means of .furthering the State’s purpose without implicating constitutional concerns,” Friedman, 487 U.S. at 66, 108 S.Ct. 2260, but those means are already in place.[7] .
The State’s argument that an in-state office requirement is necessary to regulate the behavior of nonresident attorneys fares no better. The Court has long rejected similar arguments in favor of a residency requirement on the grounds that a “nonresident lawyer’s professional duty and interest in his reputation should provide the same incentive to maintain high ethical standards as they do for resident lawyers,” and that the State, in any event, “has -the authority to discipline all members of the bar, regardless of where they reside.”[8] Piper, 470 U.S. at 286, 105 S.Ct. 1272. Similarly,' the Supreme Court has rejected the argument that an in-state office requirement is necessary to ensure the availability of attorneys for court proceedings as “unnecessary and irrational.” Frazier v. Heebe, 482 U.S. 641, 649, 107 S.Ct. *294 2607, 96 L.Ed.2d 557 (1987).[9] The Court noted that resident lawyers may still maintain their office outside of the state, thus making themselves equally unavailable to the courts, and that “there is no link between residency within a State and proximity to a courthouse.”[10] Id. at 650, 107 S.Ct. 2607; see also Barnard, 489 U.S. at 553-54, 109 S.Ct. 1294 (holding with re-spéct to challenge under Privileges and Immunities Clause that unreliable airline and telephone service of Virgin Islands did not.support a substantial justification for attorney residency requirement).
The majority, -moreover, has not engaged in a meaningful analysis of the sufficiency of the State’s proffered justifications, underscoring the extent of its departure from the established two-step inquiry under the Privileges and Immunities Clause. Instead, the majority concludes that Schoenefeld’s claim must fail at the threshold because, in its view, she has failed to prove that Section 470 was enacted ■ for a protectionist purpose, Even if such a prima facie showing is required, Schoenefeld has made one out based on the plain text and. history of Section 470.
It is undisputed that, at the time Section 470 was enacted, it was part of a larger statutory scheme designed to prohibit nonresident attorneys from practicing in New York. See Richardson v. Brooklyn City & N.R. Co., 22 How. Pr. 368, 370 (N.Y.Sup.Ct. Feb. 1, 1862) (noting that the court “ha[d] always required that an attorney should reside within the state”). Chapter 43, the earliest predecessor to Section 470, provided a less burdensome, but still burdensome, exception to the overall residency requirement as an accommodation to commuters in adjacent states. Rosenberg v. Johns-Manville Sales Corp., 99 Misc.2d 554, 416 N.Y.S.2d 708, 710 (Sup.Ct.1979) (explaining with respect to Section 470 that “[t]he requirement of residence, as a condition to-the continued right to practice, appears to have been ameliorated for attorneys who reside in an adjacent State, but only upon condition they maintain an office for the practice of law in this-State”); see also Brennan, Repeal Judiciary Law § 470, 62 N.Y.S.B.J. 20, 21 (Jan.1990) (“The primary purpose of -chapter 43 was to carve out an exception to the general rule that an attorney could not practice in the New York State courts unless he was a resident of New York State.”). The majority contends- that this statutory context is irrelevant because Schoenefeld has not been burdened by the general ban on nonresident attorneys,.which was invalidated under the Privileges and Immunities Clause in 1979. See Majority Op., ante at 282 (citing In re Gordon, 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 N.E.2d 1309 (1979)). That a discriminatory and burdensome requirement can be stylized as an “exception” to an even more discriminatory and burdensome requirement, however, does not render it nondiscriminatory or render implausible a threshold inference of discriminatory purpose.[11]
*295 - The majority further reasons that because the office requirement, like the gen-' eral ban on nonresident attorneys, was enacted in part to ensure an in-state place of service, see Richardson, 22 How. Pr. at 370, it does not exhibit a protectionist purpose. Majority Op., ante at 282. This gets it backward, however, for it is the State’s burden to prove -that service of process is a substantial interest justifying the restriction, not Schoenefeld’s burden to prove that service of process was not a motivating concern for the statute. If the majority’s rationale were sufficient, then any restriction based on residency, no matter how onerous, would pass constitutional muster so long as the State could point to a nonprotectionist purpose for the restriction. Were this the test, then there would have been no basis on which to invalidate in-state residency requirements for attorneys under the Privileges and Immunities Clause. See, e.g., Friedman, 487 U.S. at 68, 108 S.Ct. 2260 (rejecting as insufficient State’s reasons for requiring residency of attorneys seeking admission on motion, including ensuring that those applicants “have the same commitment to service and familiarity with Virginia law that is possessed by applicants securing admission upon examination” and facilitating the full-time practice of law); Piper, 470 U.S. at 285, 105 S.Ct. 1272 (rejecting State’s argument that' nonresident attorneys “would be less likely (i) to become, and remain, famil-r iar with local rules and procedures; (ii) to behave ethically; (iii) to be available for court proceedings; and (iv) to do pro Bono and other volunteer work in the State”); accord Gordon, 48 N.Y.2d at 274, 422 N.Y.S.2d at 646, 397 N.E.2d 1309 (holding that State’s justification for residency requirement, the “observation] and evaluation] [of] the applicant’s character,” was insufficient due to “alternatives which are less restrictive than denial of admission to practice which would further this interest”).[12]
Finally, the majority concludes that the. burdensome effects of Section 470 on npn-resident attorneys are not actually discriminatory because, by ensuring that every attorney that practices in New York has a “physical premises” in the State, the office requirement serves “to place resident and nonresident attorneys on an equal footing, not to favor the former over the latter.” Majority Op., ante' at 284. Thus, the majority faults Schoenefeld’s supposed failure to demonstrate that Section 470 poses an “undu[e] burden,” Majority Op., ante at 284, because she did not provide evidence to show; that significant numbers of New York attorneys in fact practice from their homes rather than *296 from offices or that a nonresident’s burden of maintaining an office in New York is greater than a resident’s burden of maintaining, a home in New York. As a factual matter,.the majority’s conclusion that the law poses no undue burden on nonresident attorneys directly conflicts with our findings earlier in this case. See Schoenefeld, 748 F.3d at 468 (“This additional obligation [on nonresident attorneys] carries with, it significant expense — rents, insurance, staff, equipment inter alia — all of which is in addition to the expense of the attorney’s out-of-state office, assuming she- has one.”).[13] More importantly, these imagined burdens lose sight of the governing legal standard: “whether the' State has burdened the right to practice law, a privilege protected by the Privileges and Immunities Clause, by discriminating among otherwise equally qualified applicants solely on the basis of citizenship or residency.” Friedman, 487 U.S. at 66-67, 108 S.Ct. 2260. Though the Clause “does not promise nonresidents that it will be as easy for [them] as for residents to comply‘with a state’s law,” Schoenefeld, 748 F.3d at 467 (internal quotation omitted), a “wholesale bar has never been required to implicate the [Clause],” Crotty, 346 F.3d at 95. Here, it is enough that Section 47Ó substantially burdens nonresident attorneys by requiring them, and only them, to maintain separate office premises within the State.
The majority asserts that Section 470 places all attorneys on equal footing because the statute is, in effect, no different from a law that requires all attorneys to maintain a “physical presence”- in New York. See Majority Op., ante at 284. But unlike the statutes upheld as constitutional in Kleinsmith v. Shurtleff, 571 F.3d 1033, 1044-45 (10th Cir.2009) and Tolchin v. Supreme Court of N.J., 111 F.3d 1099, 1107-08 (3d Cir.1997), which require all attorneys to maintain a physical presence within the State, Section 470 explicitly draws a distinction based on residency.- ‘ This case is thus analogous to Piper and Friedman, where states’ restrictions on legal practice that applied only to nonresidents were invalidated under the Privileges' and Immunities Clause; Friedman, 487 U.S. at 70, 108 S.Ct. 2260; Piper, 470 U.S. at 288, 105 S.Ct. 1272. The Supreme Court, moreover, has long rejected the notion that a State’s authority to pass a facially neutral law also empowers it to pass a discriminatory law. Friedman, 487 U.S. at 66-67, 108 S.Ct. 2260 (“A state's abstract authority to require from resident and nonresident alike that which it has chosen to demand from the nonresident aloné has never been held to shield the discriminatory distinction from the reach of the Privileges and Immunities Clause.”). That New York could enact some other law that does not distinguish between residents and nonresidents is entirely inapposite to the question before us now.
III.
The State of New York has chosen to discriminate against nonresident attorneys with regard to their right to pursue a common calling, and it has failed to provide a- substantial justification for that discrimination. In holding to the contrary, *297 the majority unnecessarily disturbs longstanding Privileges and Immunities jurisprudence and denies nonresident attorneys their constitutionally-protected right to practice law “on terms of substantial equality” with residents of New York. Piper, 470 U.S. at 280, 105 S.Ct. 1272. For these reasons, I respectfully dissent.

. The majority’s application of McBumey, which was decided before our prior opinion in this case,'is particularly striking given that we did not rely on McBumey to uphold the constitutionality of'Section 470 at that time. See Schoenefeld, 748 F.3d at 469. Instead, in apparent contravention of New York’s consti-tutionál requirements for certification, this Court certified' a question to the Court of Appeals that was not necessary to our ■ decision. Cf. Osterweil v. Bartlett, 706 F.3d 139, 142 (2d Cir.2013) (stating that,, prior to certifying a question to the Court of Appeals, this Court must determine “whether the certified question is. determinative of a claim before us”- (internal quotation omitted)); Retail Software Servs., Inc. v. Lashlee, 71 N.Y.2d 788, 790, 530 N.Y.S.2d 91, 92, 525 N.E.2d 737 (1988) (declining to answer certified question because it did not satisfy the requirement that it "may be determinative" of the pending action, ,as required by the New York Constitu-tioh). As we recognized’in our prior opinion, ”[t]he constitutionality of [Section] 470 turns on the interpretation of a provision of the statute that implicates significant New York state interests and is determinative of this appeal.” Schoenefeld, 748 F.3d at 467.

. Rather than unanimously altering the longstanding Privileges and Immunities analysis through dicta without acknowledging as much (or generating a single dissenting opinion), the better reading is that the McBumey decision adhered to the traditional two-step analysis.

. The Court, by contrast, rejected the plaintiffs Privileges and Immunities challenge based on the asserted "right to access public information on equal terms with citizens of the Commonwealth” at the threshold by determining that the Clause did not "cover[] this broad right.” McBurney, 133 S.Ct. at 1718-19.

. The majority states that it is "not obvious” under McBumey whether the State’s protectionist purpose, is- properly considered at the first or second step of the inquiry, noting that the burden shifts to the defendants at the second step, see, e.g., Supreme Court of Va. v. Friedman, 487 U.S. at 67, 108 S.Ct. 2260, whereas McBumey emphasized the nonresident plaintiff’s failure to plead or allege proof that Virginia’s FOIA was enacted with a protectionist purpose, see 133 S.Ct. at 1715-16. Majority Op., ante at 281. The tension the majority perceives between Friedman and McBumey, however, is due entirely to a strained reading of McBumey. The majority’s "discriminatory intent” requirement, in any event, remains novel to .privileges and immunities jurisprudence whether it is grafted onto the first or second step of the inquiry. ■

. By comparing this case with Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the majority inadvertently highlights the distinctions between the burden-shifting tests that govern' Equal Protection and Privileges and Immunities claims. Majority Op., ante at 281 n. 6, In Village of Arlington Heights, an Equal Protection case,' the Court explained that if a plaintiff demonstrates' that a challenged decision was "motivated in part by a racially discriminatory purpose,” then the burden shifts to the government to establish that the "same decision would have resulted even had the impermissible purpose not been considered.” Id., at 270 n. 21, 97 S.Ct. 555. To state a claim under the Privileges and Immunities Clause, by contrast, a plaintiff must demonstrate that "a challenged restriction deprives nonresidents of a privilege or immunity protected by this Clause," Barnard, 489 U.S. at 552, 109 S.Ct. 1294, in which case the restriction is invalid unless "(i) there is á substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a 'substantial relationship to the State’s objective,” .id. The former inquiry requires a threshold showing of, discriminatory intent; the latter plainly does not.

. Indeed; even a state regulation that "d[oesj not on its face draw any distinction based on citizenship or residence” may implicate the Privileges and Immunities Clause where "the practical effect of the provision [is] discriminatory.” Hillside Dairy Inc. v. Lyons, 539 U.S. 59, 67, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003).

. As the majority notes, New Jersey has eliminated its physical office requirement in favor of various other less onerous conditions. See Majority Op., ante at 285 n. 13, Further, the New York City Bar permits resident attorneys to maintain a "virtual law office” in New York even if their practice is located primarily out of state, a privilege that is not afforded to nonresidents. Assoc, of the Bar of the City of New York Comm, on Prof, Ethics, Formal Opinion 2014-2: Use of a Virtual Law Office by New York Attorneys (June 2014), available at http://www.nycbar.org/ethics/ethics-opinions-local/2014opinions/2023-formal-opinion-2014-02. That such accommodations exist solely for resident attorneys’ further undermines Section 470’s nonprotectionist rationale and demonstrates the existence of less-restrictive alternatives to the office requirement.

. The Supreme Court’s decision in Friedman is not to the contrary. The Court did not hold, as the majority asserts, Majority Op., ante at 286, that an office requirement would ' provide a "nonprotectionist alternative” to a residency requirement. Rather, in holding unconstitutional Virginia’s residency require- ■ ment for admission on motion, the Court noted .in. dicta, without deciding the constitutionality of that, alternative means, that an office ■requirement would -be less restrictive.. 487 U.S. at 70, 108 S.Ct. 2260.

. The Court’s holding was pursuant to its supervisory authority over the lower federal courts rather than .the Privileges and Immunities Clause, see id., but. its reasoning is equally applicable here.

. For example, an attorney practicing in Princeton, New Jersey would be far more accessible to New -York City courts than" an attorney located in Buffalo, New York, With respect to attorneys who reside a great distance from the State, the Court in Piper suggested that they could be required to retain a local attorney for the duration of court proceedings and to be available to the court on short notice, Piper, 470 U.S. at 287, 105 S.Ct. 1272.

.The legislature’s failure to amend or repeal Section -470 after New York’s -residency requirement was held unconstitutional, see Gordon, 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 *295 N.E.2d 1309, compounds, not alleviates, the constitutional problem, as the Gordon decision put the legislature on notice that the restrictions it placed on nonresident attorneys could be constitutionally problematic. . Indeed, following Gordon, members of the legislature attempted, ■ albeit unsuccessfully, to amend Section 470 to permit nonresidents to practice in New York without an office so long^ as they did not appear as the attorney of record. See J.A. 130-32. Regardless of whether that amendment would have effectively resolved the constitutional issue, its proponents were compelled by the conclusion that “Gordon and Piper .. .‘command elimination of residency requirements as á condition upon the right to practice law.” J.A. 132.

. In none of the above cases, moreover, did the courts dissect the legislative history of the pertinent restrictions iri order to discern a possible nonprotectionist purpose, as the majority does in this case. Rather, upon finding that the State’s restrictions were discriminatory, the State was required in those cases to explain why, at that time, the restrictions were justified. Cf. McBurney, 133 S.Ct. at 1715-16 (examining plain text of Virginia statute to determine whether distinction between residents nnd nonresidents had a protectionist aim).

. Although the majority brushes aside these findings as "dicta,” Majority Op., ante at 284 n. 11, the significant burden On nonresidents of maintaining an in-state office was central to our determination that Section 470, if interpreted to impose an in-state office requirement, "discriminates against nonresident attorneys with respect to their fundamental right to practice law in the state and, by virtue of that' fact, its limitations on nonresident attorneys implicate the Privileges and Immunities Clause.” Schoenefeld, 748 F.3d at 469.